## Case No. 11,059.

### The PEYTONA.

[1 Ware, 541.] [1]

District Court, D. Maine. July 24. 1854. [2]

AFFREIGHTMENT—STOWAGE UNDER DECK—DAMAGE TO GOODS ON DECK—MASTER AS WITNESS FOR OWNERS—RELEASE.

1. Under a contract of affreightment, whether in writing or verbal, for the transportation of merchandise on the high seas, the master is bound to have it safely stowed under deck.

---

[1] [Reported by Hon. Ashur Ware, District Judge.]

[2] [Affirmed in Case No. 11,058.]

2. If it is carried on deck without the consent of the shipper, and suffers damage by any accident that would not have happened to it equally under deck, the master and owners must bear the loss.

3. In a libel against the ship on a contract of affreightment by the shipper, the master is not a competent witness for the owners without a release, but if there are several owners, a release by a part of them is sufficient.

This is a libel in rem against the schooner Peytona, on a contract for the transportation of 472 hides from Boston to Belfast, consigned to Messrs. Lewis & Miller. The hides were stowed on deck, and on the voyage 184 were either washed overboard, or thrown over by the crew on account of stress of weather, and for the safety of the ship. The residue were carried to Belfast; but the harbor being frozen, the vessel was not able to reach the wharf of the consignees, and the hides were taken out on the ice, carried ashore in sleighs, and left on another wharf. There they were exposed to the changes of the weather for four or five weeks, and by this exposure, received, as is alleged in the libel, material damage. No notice of the arrival of the goods was given to the consignees, and the libellant not hearing from them as he expected, and having some time afterwards been informed that they had been shipped, found, by inquiry, that they had arrived, and were on Miller's wharf. The hides were examined on the wharf by two tanners, and they reported the damage equal to one dollar on a hide, upon an average. But on a further and more critical examination by one of the witnesses, to whom they were delivered to be tanned, he says that 20 of the hides were badly damaged to the extent of 50 or 75 per cent. of their value, but with respect to the remainder, he could not say whether they had sustained any injury, or if any, how much. The libellant claimed damages for the 184 hides lost, and for the injury to the hides that were delivered, by exposure on the wharf.

Mr. Evans, for libellant.

Fessenden. & Deblois, for respondents.

WARE, District Judge. There can be no doubt that the loss of the hides that were washed overboard by the sea, or thrown over by the crew, is to be ascribed solely to the fact of their being carried on deck, because the whole cargo stowed under deck arrived safe; and in point of law, that the ship is herself bound in specie for the safe delivery of the merchandise according to the contract of affreightment, the dangers of the seas excepted, admits of as little doubt. The question of her liability in this case depends on this fact, whether the master by the law of the sea, or by the terms of his contract, was authorized to carry the hides on deck. I take it to be too clear to admit of controversy, that under a common contract of affreightment the maritime law binds the master to have the cargo safely stowed under deck. This is the ordinary mode of stowage, and it is a condition ordinarily implied in every contract for the transportation of merchandise in sea-going vessels on the high seas. A clean bill of lading, that is, one which is silent as to the mode of stowage, always imposes the obligation of securing the goods under deck. 3 Kent, Comm. 206. And there is no reason why the same principle should not apply when the contract is verbal. If they are carried on deck, it is at the master's risk, and if they are lost or damaged by any accident, that would not have been equally fatal if they had been secured under deck, the master and owners must bear the loss, or the merchant, at his election, may proceed directly against the ship herself. But this right, as to stowage of his goods, is in favor of the shipper, and, like all other rights, may be waived, and the only question of difficulty in this part of the case is, whether it was so waived. The evidence which has a bearing on the question is somewhat contradictory, and not easily reconcilable. The contract was verbal. Cunningham, a witness for the libellant, and a clerk in the house of McLafflin & Co., the shippers, says that he went to the wharf to find a vessel, and there found the Peytona, of which one of the house was a part owner, bound to Belfast. He inquired for the master by name, but the master having been recently changed, he asked a man on board, who appeared to be master, and in fact was so, whether he could take a quantity of hides to Belfast, and he agreed to take them. There was no agreement as to the freight, but they were to go at the common rate of freight. Nothing was said, according to this witness, as to their stowage, whether on deck or under deck. He left, saying that they would be sent down in the afternoon.

The master was offered as a witness on the part of the respondents, and objected to, on the ground that he had an interest in the event of the suit. A release was then offered, signed by all the co-owners, except one, and this was objected to because it was not signed by all. Undoubtedly if the master was guilty of a fault, for which his owners were responsible, and they suffered, he might be answerable over to them, and would therefore be inadmissible as a witness, on the ground of interest, without a release. But a release of part of the co-owners is sufficient. If they should have any right of action against him, it would be a joint action, and a release of one of the joint parties would be as effectual a bar to the action as a release by all. 1 Greenl. Ev. 427, note. The testimony of the master, as well as that of the mate, differs in some respects from that of Cunningham. According to them, a young man came to the vessel in the morning to engage transportation for a quantity of hides. The master told him he would take them, but that the vessel was full below, and that they must go on deck. On this he said that he would return to the store for orders, and that some time after he came back and said that the hides would be sent down in the afternoon. This is stated more

particularly by the mate, but in this part of his testimony, he is certainly under a mistake. Cunningham, who made the contract, did not return, and the mate is also mistaken as to the person who engaged the freight. But the hides were received in the afternoon of the same day and put on deck. Pingree, a clerk in the store, brought down a bill of lading. The master, after examining it, declined to sign it, because the consignment was to a firm that had dissolved, and ceased to do business. Pingree then returned to the store and brought another bill of lading, by which the hides were consigned to Lewis & Miller. The master also declined signing that, because the harbor was frozen and he could not carry his vessel to their wharf. Pingree then left, on the promise of the master, as he says, that he would go to the store and there execute a bill of lading. He failed to go, and left Boston with the hides without signing one.

This is the substance of the testimony which goes to show the nature and conditions of the contract. Without imputing to any of the witnesses intentional misrepresentation, it appears to me that the reasonable inference from the whole is, that this was a common and ordinary contract of affreightment. It is a common and well-known practice for vessels in this trade to carry a deck-load, and it is proved in the present case that it is not unusual to carry green hides on deck. The shipper and the master know perfectly well that where they are so carried, it is at the master's risk, unless the shipper consents to take it on himself. Even then if it were admitted that Cunningham knew that the hides if taken must be carried on deck, it would not of necessity follow that the risk would be shifted from the master to the shipper. He might be willing that they should be thus carried on the master's responsibility, as is often if not most usually done by packet masters in the coasting trade. When the bills of lading were brought to the master for his signature, he twice objected to signing them for different reasons. But though they were in the common form, he made no objection on that account. And yet he well knew that under such a bill of lading he took the risk of a deck passage on himself. His not objecting to the bill of lading on this account can hardly be considered less than a tacit admission, as full freight was charged, that the risk was to be on him. If this be a correct view of the evidence, it follows that the ship is liable for the loss of the deck-load.

The second claim is for the injury sustained by the hides which were exposed on the wharf. The master knew to whom they were consigned. He declined signing a bill of lading, which required him to deliver them at the wharf of the consignees, on account of the obstruction of the ice: and this might perhaps excuse him for landing them at some other convenient place. As a general rule a delivery of the goods on the wharf is sufficient to discharge the master. The consignee must be there ready to receive the goods, and the master is not bound, in ordinary cases, to transport them to his storehouse. But, as it is justly observed by Chancellor Kent, the rule has this reasonable qualification. They must be there delivered to some one, who is authorized to receive them, or a previous notice must be given to the consignee of the time and place of delivery, and the master is not justified without such notice in leaving them unprotected and exposed on the wharf. 3 Kent, Comm. 315. In this case, no notice was given, but the hides were left exposed to the weather on an open wharf, nor did the consignees know of their arrival until they were informed by the owner, who went to find his goods. The damage they received from this exposure was through the fault and neglect of the master, or the agent of the vessel, and for this the owners are responsible.

The whole number of hides was 472, and the whole cost $2,527.21, giving an average of a fraction over $5.35 for a hide, and $985.18 for 184 lost. Twenty hides were damaged from 50 to 75 per cent.—on an average 62½ per cent. The loss being $107.08, the damage at 62½ per cent. will be $66.92, making a total of $1,052.10. Decree, $1,052.10 damages, and costs.

[On appeal to the circuit court, the decree of this court was affirmed. Case No. 11,058.]